UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

```
┌─────────────────────────────────┐
│ MARCELLA J. WOOTEN,             │
│                                 │
│         Plaintiff,              │
│                                 │
│    v.                           │
│                                 │
│ COMMISSIONER OF SOCIAL          │
│ SECURITY ADMINISTRATION,        │
│                                 │
│         Defendant.              │
│                                 │
└─────────────────────────────────┘
```

HONORABLE JEROME B. SIMANDLE

CIVIL NO. 06-5095

**OPINION**

APPEARANCES:

Brian G. Smith, Esq.
COMMUNITY HEALTH LAW PROJECT, INC.
900 Haddon Ave.
Suite 400
Collingswood, NJ 08108
     Attorney for Plaintiff

Margaret Ann Donaghy, Esq.
OFFICE OF THE US ATTORNEY
26 Federal Plaza
Suite 3904
New York, NY 10278
     Attorney for Defendant

**Simandle, District Judge:**

I.    **INTRODUCTION**

    This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2006), to review the final decision of the Commissioner of the Social Security Administration ("Commissioner" or "Defendant") denying the application of Plaintiff, Marcella Wooten ("Plaintiff"), for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§

401-434, and for Supplemental Security Income ("SSI") under Title
XVI of the Act, 42 U.S.C. § 1381a.  This Court must decide
whether the Commissioner properly determined that Plaintiff is
capable of performing work available in the national economy and
is, therefore, not disabled.  For the reasons explained below,
the Court shall remand the decision of the Commissioner for a
determination of how Plaintiff's panic attacks and hallucinations
would affect her ability to perform work available in the
national economy.

## II.  BACKGROUND

### A.  Procedural History

Plaintiff filed applications for DIB and SSI on July 8,
2002, alleging a disability onset date of May 3, 2000.  The
applications were denied and Plaintiff filed a request for
reconsideration on April 28, 2003, which was also denied, on May
29, 2003.  Plaintiff then filed a request for a hearing, which
was held August 24, 2004 before Administrative Law Judge William
Reddy ("the ALJ" or "ALJ Reddy").  On September 24, 2004, ALJ
Reddy issued his decision denying Plaintiff entitlement to DIB
and SSI benefits.

The ALJ found that Plaintiff had not engaged in substantial
work activity since May 3, 2000, her alleged onset date.  He next
examined the severity of her impairments.  The ALJ found that
Plaintiff suffers from "major depression, a panic disorder,

asthma, diabetes mellitus, disorders of the neck, hypertension, right shoulder impairment, and a seizure disorder."  (R. at 25.) The ALJ found that these impairments cause significant "vocationally relevant limitations" on Plaintiff, in other words that they were severe, but that any alleged low-back pain and carpal tunnel syndrome do not impose such limitations and are not severe.  (Id.)

Next, the ALJ determined that none of these impairments meets or exceeds the criteria in any of the listed impairments in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (R. at 28.)  The ALJ determined, however, that Plaintiff's capacity to work was limited but that she retained the capacity for "a restricted range of light work"; that she cannot push and pull with her right arm; balance; climb ladders, ropes, or scaffolds; or reach overhead with her right arm.[1]  The ALJ also found that Plaintiff can only occasionally climb stairs, bend, kneel, or crouch; that she should avoid frequent exposure to extremes of hot and cold temperature, wetness, humidity, fumes, odors, dusts, gases and poor ventiliation; and that she should avoid all hazards, such as moving machinery and unprotected heights.  ALJ Reddy also found that Plaintiff had the mental residual capacity "to perform simple, routine tasks, with no more than occasional interactions

---

[1]  Plaintiff is right-handed.  (R. at 451.)

3

with supervisors and fellow employees, and she is to have no contact with the general public." (R. at 29.)

Plaintiff filed a request for review of that hearing decision, which was denied by the Appeals Council on July 28, 2006. Thus, the decision of the ALJ became the final decision of the Commissioner. Plaintiff timely filed this action.

**B.   Evidence in the Record**

1.   Records of Psychological Impairment

There is significant evidence in the record that Plaintiff suffers from panic attacks, severe depression, and hallucinations. While the ALJ addressed Plaintiff's responses to stress in his assessment of Plaintiff's RFC, he failed to discuss how her panic attacks or her hallucinations would affect her employability.

An August 2000 evaluation by Dr. Edward Tobe, D.O., indicated that Plaintiff reported a life-long history of anxiety and depression, including auditory hallucinations in the late 1980s. Dr. Tobe estimated that Plaintiff was 75% permanently impaired by her psychiatric disabilities. (R. at 453.)

Dr. Rudy Horwitz, a Psy.D., evaluated Plaintiff in January of 2002, as part of her attempt at vocational rehabilitation. (R. at 359-63.) Using objective testing (R. at 362), Dr. Horwitz determined that there were clinical indications of anxiety and depression, and perhaps Posttraumatic Stress Disorder. (R. at

4

363-63.)  (Plaintiff suffered significant abuse in her childhood and adult life.)

Dr. D'Ambola completed a medical evaluation of Ms. Wooten in July of 2002 and diagnosed her with panic disorder, severe anxiety, and major depression, and referred her to the South Jersey Behavioral Health Center for mental health treatment.  (R. at 347-48.)  A similar diagnosis, "Phobic Anxiety (Panic Disorder)," had been rendered in February 2001.  (R. at 355.)

An intake form filled out by South Jersey Behavioral Health Resources in 2002, indicated that Ms. Wooten reported experiencing visual hallucinations, including a "black shadow." (R. At 391.)

In April 2003, Plaintiff again visited South Jersey Behavioral Health, and she was described as suffering from "anxiety, depression, [and] anger/rage."  (R. at 436.)

On June 2, 2003 a psychiatric evaluation at South Jersey Behavioral Health Resources indicated that Plaintiff "acknowledges v[isual] hallucinations, [but] is not willing to take antipsychotics at this time."  (R. at 429.)[2]  Again, the intake form indicated hallucinations and referred to a "dark figure."  (R. at 431.) Plaintiff was diagnosed with major depressive disorder with psychotic features. (R. at 434.)

---

[2]  This assessment was performed by an individual whose name is illegible, but who is a PhD with a Masters of Science in Nursing and a CNS, Clinical Nurse Specialist degree. (R. at 435.)

In August of 2004, Jennifer Sherman, a licensed counselor, composed a letter to Plaintiff's representative summarizing Plaintiff's treatment with South Jersey Behavioral Health Resources.  Ms. Sherman indicated that she had been treating Plaintiff since April 2003 and that her diagnosis was major depressive disorder recurrent severe with psychotic features. (R. at 428.)

On August 18, 2004, Ms. Sherman completed a SSA form, "Medical Source Statement Concerning the Nature and Severity of an Individual's Mental Impairment."  (R. at 454 - 57.)  Ms. Sherman indicated that Plaintiff was "not significantly limited" in the following abilities:

> to remember locations and work-like procedures;
> to understand and remember very short and simple repetitive instructions or tasks;
> to understand and remember detailed instructions or tasks that may or may not be repetitive;
> to carry out short and simple instructions or tasks;
> to carry out detailed instructions that may or may not be repetitive;
> to make simple work-related decisions;
> to ask simple questions or request assistance from supervisors;
> to be aware of normal hazards and take appropriate precautions;
> to travel in unfamiliar places and/or to use public transportation; and
> to set realistic goals or to make plans independently of others.

Ms. Sherman indicated that Plaintiff was moderately limited[3] in her abilities to:

> maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break, and departure) with four such periods in a workday;
> perform activities within a schedule, maintain regular attendance and be punctual with customary tolerances; and
> sustain an ordinary routine without special supervision.

Ms. Sherman indicated that Plaintiff was markedly limited[4] in her abilities to:

> work in coordination with or proximity to others without being unduly distracted by them;
> complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
> interact appropriately with the general public or customers;
> accept instructions and to respond appropriately to criticism from supervisors;
> get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes;

---

[3]  "Performance of the designated work-related function is not totally precluded, but is substantially impaired in terms of speed and accuracy and can be performed only seldom to occasionally during an 8-hour workday, for example, for short duration lasting from 5 to 15 minutes not totalling more than 2 to 3 hours in an 8-hour workday."  (R. at 454.)

[4]  "Performance of the designated work-related mental function is totally precluded on a sustained basis and would result in failure after even short durations, for example from 5 to 15 minutes."  (R. at 454.)

maintain socially appropriate behavior;
and respond appropriately to expected and
unexpected changes in the work setting.

Ms. Sherman noted that "the following work-related stressors
would increase the level of impairment beyond those indicated
above:"

unruly, demanding or disagreeable customers
even on an infrequent basis;
production demands or quotas;
a demand for precision (intolerance of error
rates in excess of 5% to 10%);
a need to make quick and accurate,
independent decisions in problem solving on a
consistent basis; and
a need to make accurate, independent
decisions in problem solving on a consistent
basis.

(R. at 456.)

Ms. Sherman further indicated that Plaintiff is "the type of
person for whom a routine repetitive, simple, entry-level job
would serve as a stressor which would exacerbate instead of
mitigate psychological symptoms in the workplace." (Id.)  She
also indicted that Plaintiff's disabilities would cause her to be
unable to complete a workday more than three or four times per
month.  (R. at 457.)  The ALJ rejected these indications and
failed to address the fact that Plaintiff was likely to have
continuing psychological - as opposed to cognitive - impairments
that might impact on her ability to work without breaks as
needed.

In her comments on this form, Ms. Sherman wrote:

8

> Marcella's ability to handle stress or
> criticism is severely limited.  She has
> reacted with very intense emotions to
> stresses: the level of intensity of emotion
> frequently being more than the situation
> justifies.  She has the potential to be
> verbally and physically aggressive when she
> feels hurt or threatened in any way.  She
> would mostly be affected by dealing with
> other people or pressure.

(R. at 457.)  The ALJ appeared to accept this assessment as valid when accommodating Plaintiff's need for a low-stress workplace in formulating her RFC.

In addition to this medical evidence, Plaintiff testified that it is difficult for her to concentrate because she hears voices in her head, as noted below.  The ALJ did not impugn the credibility of Plaintiff's testimony, which appears to be supported by the psychological treatment evidence.[5]

Thomas Rodriguez, with whom Plaintiff was living at the time, also submitted evidence about Plaintiff's abilities.  Mr. Rodriguez indicated that Plaintiff cries frequently, sometimes refuses to speak, and gets confused.  (R. at 145-46.)  He also indicated that she doesn't like to be around other people and that she likes everything quiet.  (R. at 146.)

---

[5]   The State of New Jersey performed a mental status examination of Plaintiff in March 2003, as part of her application for disability benefits.  At that time, she regularly volunteered with children at an after-school program, read, and listened to music. (R. at 406.) However, she testified, as discussed below, that she is unable to do these things any more and the ALJ appeared to accept that testimony as credible.

Thus, there is ample evidence that Plaintiff suffers from depression, anxiety, panic attacks, and hallucinations. Accordingly, the Commissioner should have considered whether such impairments, whether severe or not, might affect Plaintiff's RFC and her ability to work.

        2.   Plaintiff's Testimony

Plaintiff testified at her hearing that she has lived alone since 2001, but that her son spends a lot of time with her. (R. at 478.)  She said she has a driver's license, but no car, so she drives only a few times a month, when no one is available to take her. (R. at 479.)  Plaintiff testified that she has some college education. (Id.)  Since May 3, 2000, she worked only for about one month in telemarketing, but found that it was frustrating and overwhelming for her because she would suffer panic attacks at work. (R. at 479-80.)

Plaintiff talked about her past work at Our Lady of Lourdes Medical Center, where she was a secretary. (R. at 481-82.)  She testified that she left that position because of an injury.  She was sitting at her desk when a large shelf with files collapsed onto her, striking her in the head and shoulder. (R. at 482.)  Plaintiff testified that she filed a worker's compensation claim, underwent shoulder surgery, and continues to experience neck pain to this day. (Id.)  Plaintiff also testified that she is in "constant pain" from her right shoulder. (R. at 483.)   She also

10

testified that laying her head down on a pillow causes her "excruciating pain" in her neck and that she has to sleep with a neck brace. (R. at 484.) The pain from her neck radiates into her shoulder, causing cramping, a need to stretch periodically, and change positions from sitting and standing. (Id.) Plaintiff testified that she is not currently receiving treatment for her neck or shoulder other than using the neck brace and taking medication. (R. at 485.)

Plaintiff testified that she takes Dilantin to control a seizure disorder and that she only has seizures about two to three times per year that she is aware of, but that she sometimes experiences them in her sleep, so she can not be sure of the number. (Id.)

Plaintiff also testified that she takes oral medication to treat her Type II Diabetes and, upon being asked whether her blood sugars are controlled, she stated that "they fluctuate." (Id.)

As for her asthma, Plaintiff testified that she uses an albuterol inhaler[6], a steroid inhaler, and a nebulizer[7]. (Id.)

---

[6] Albuterol is a type of bronchodilator that is used to counteract the airway contstriction characterized by asthma. Stedman's Medical Dictionary, "asthma" (27th Ed. 2000) (available on Westlaw).

[7] A nebulizer is a "device used to reduce liquid medication to extremely fine cloudlike particles; useful in delivering medication to deeper parts of the respiratory tract." Stedman's Medical Dictionary, "nebulizer."

Plaintiff testified that she has to use the nebulizer one to three times per week.  (R. at 486.)

Plaintiff then discussed her mental health.  She reported that she sees a therapist every two weeks and that she takes several prescription medications, Lexapro[8], Klonopin[9], Neurontin[10], and Amitriptyline[11].  (R. at 486.)  She testified ambiguously about whether the medications were effective in treating her depression, noting that she "had to keep switching medicine" and then Plaintiff apparently became upset, because she began detailing the misfortunes in her life that had caused her to suffer grief and sadness.  (R. at 486-88.)  Plaintiff did not report any side effects from her psychiatric medications.  (R. at 488.)

Plaintiff then testified about her ability to lift things. She said she could lift things "very well" on her left side, but that she was "limited" on her right.  (Id.)  Initially she said

---

[8]  Lexapro "is an orally administered selective serotonin reuptake inhibitor," used to treat depression.  See Physician's Desk Reference for Prescription Drugs, "Lexapro" (2007) (available on Lexis).

[9]  Klonopin is used to treat both seizure disorders and panic attacks.  Physician's Desk Reference for Prescription Drugs, "Klonopin."

[10]  Neurontin is a treatment for epilepsy.  Id. at "Neurontin."

[11]  Amitriptyline is an antidepressant.  See id. at "Carbatrol Capsule" (amitriptyline discussed in contraindications).

she could lift about thirty to forty pounds, using both hands,
but when prompted to think about it in terms of a gallon of milk,
Plaintiff said she could not hold a gallon of milk on her right
side, but that she could on her left side and could carry it.
(R. at 489.)

Plaintiff testified that she goes outside only when she
must, and that she could walk about a block and a half.  (R. at
489.)  At that point, she testified,

> I become so tired and then all, all the horns
> and the sirens and the music and all of that,
> its just like I freeze.  I feel lost.  I,
> again, I get the sweating and I feel panicky
> and I have to look around and gather myself,
> where am I?  What am I supposed to be doing?
> And just wait, you know.

(Id.)  Plaintiff appeared to be describing a panic attack.

Plaintiff testified that she could stand for about forty-
five minutes to an hour and could sit for about an hour before
she gets cramps and needs to change positions.  (R. at 490.)

Plaintiff then testified about the limitations she has in
performing household chores and caring for herself.  Due to her
pain on her right side, Plaintiff testified that she cannot get
things down from high shelves in her home, mop the floors,
vacuum, she can't bake or cook in the oven because it hurts to
lift things out, and she can't launder her own clothes or linens.
(R. at 491-92, 495.)  Plaintiff testified that her inability to
perform these tasks depresses her because she feels "useless."

(R. at 492.)  However, she also testified that she is able to
shower on her own, dress herself, and cook on the stove top or in
the microwave.  (R. at 495.)  She can also dust things so long as
she doesn't need to reach overhead.  (Id.)

Plaintiff also testified that she has difficultly
concentrating, that she cannot follow the story lines in
television programs or read books, which she used to love to do.
(Id.)  She told the ALJ that she loses her concentration because
"it's like all these thoughts keep running like I'm talking to
you now, I have a million and one voices coming at me.  You know,
I can't stay focused for so long."  (R. at 492-93.)  It was
unclear whether Plaintiff was referring to auditory
hallucinations, severe self-doubt, or something else.

Plaintiff said that she has memory loss and that she avoids
being around other people because she thinks they are making fun
of her.  (R. at 493.)  Plaintiff said she never takes public
transportation because "I don't like the stopping and going and
the pushing, the different smells and a lot of things that people
saying on the bus, I don't like all that noise."  (R. at 494-95.)
Plaintiff had a similar complaint about grocery shopping, which
she does with her children.  "I don't like shopping because
everybody be pushing all up on everybody."  (R. at 495.)

Plaintiff testified that she visits her daughter's home once a week and that other than that, the only other times she travels are to medical appointments.  (R. at 496.)

On examination from her non-attorney representative, Plaintiff testified that she has been treated for anxiety and depression at South Jersey Behavioral Health since 1988 and that in 2000, after she was injured at work, her "whole life changed" because she had to have constant assistance to do things she had been able to do on her own, she lost her self-confidence and is now in constant pain that affects her ability to focus and concentrate, and that her sleep disturbances and hallucinations, as well as her feelings of anxiousness and depression have worsened significantly.  (R. at 496-99.)

        4.   Testimony of Vocational Expert

A vocational expert ("VE"), William Slaven III, also testified at Plaintiff's hearing.  He testified that Plaintiff's past work as secretary and a pharmacy technician were semi-skilled work with light levels of exertion.  (R. at 500.)  Mr. Slaven also testified that Plaintiff's past work as a receptionist at a childcare center was unskilled work with a light exertional level.  (R. at 500-01.)

The ALJ then asked the VE the following hypothetical: Would a person with the following characteristics be able to find work?

- limited to light exertional work;
- no pushing and pulling with the right upper extremity;

15

- Ms. Wooten's age of 47;
- high school "plus" education;
- Ms. Wooten's work experience;
- an inability to climb ladders, ropes, scaffolds, or to balance;
- no overhead reaching with the right upper extremity;
- avoid frequent exposure to extremes in hot and cold temperature, wetness, humidity, fumes, odors, dusts, gases and poor ventilation;
- avoid all exposure to hazards such as moving machinery at unprotected heights; and
- limited to simple routine tasks with no more than occasional contact with supervisors and fellow employees and no contract with the general public.

(R. at 501.)  Thus, the ALJ's first hypothetical omitted any reference to Plaintiff's alleged need to change positions frequently, her need for breaks from standing and/or sitting to stretch and walk, or the effects of panic attacks and hallucinations.

The VE responded that such an individual would be able to work as an assembler of small products in any industry, an assembler of plastic hospital products, and as a marketing clerk. (R. at 502.)

The ALJ then asked about someone with the same limitations as in his first hypothetical plus these additional limitations: being able to sit only for four hours, stand and walk for four hours, and to walk for ten minutes every hour; needing to shift at will from sitting, standing or walking; unscheduled breaks twice daily for ten minutes, plus the regular breaks; ability to lift and carry ten pounds frequently; significant limitations in repetitive reaching, handling and fingering; and would be absent

from work more than three times per month.  The VE testified that such an individual would not be able to find work in the national economy.  (R. at 503.)

The ALJ then posed a third hypothetical to the VE, using the marked psychological limitations Ms. Sherman had noted on her August 2004 form.  (R. at 503-04.)  The VE indicated that someone with those marked limitations would not be employable.  (R. at 504.)  At no point did the VE opine on how panic attacks or hallucinations affect one's ability to work.

## III. DISCUSSION

### A.   Disability Defined

The Social Security Act defines "disability," for purposes of an individual's entitlement to DIB and SSI benefits, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A).  Under this definition, a claimant qualifies as disabled,

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy

17

exists for him, or whether he would be hired
if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

Substantial gainful activity is "work that - (a) involves doing significant and productive physical or mental duties; and (b) is done (or intended) for pay or profit."  20 C.F.R. § 404.1510.  This definition presupposes a regular, continuing, and sustained ability to perform such work.  Kangas v. Bowen, 823 F.2d 775, 778 (3d Cir. 1987).

The Commissioner has promulgated regulations that determine disability by application of a five-step sequential analysis codified in 20 C.F.R. § 404.1520.  The Commissioner evaluates each case, step-by-step, until a finding of "disabled" or "not disabled" is obtained, 20 C.F.R. § 404.1520(a), summarized as follows:

> 1. If the claimant currently is engaged in substantial gainful employment, the claimant is "not disabled."
>
> 2. If the claimant does not suffer from a "severe impairment," the claimant is "not disabled."
>
> 3. If the severe impairment meets or equals a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and has lasted or is expected to last for a continuous period of at least twelve months, the claimant is "disabled."
>
> 4. If the claimant can still perform work the claimant has done in the past ("past relevant work"), despite the severe impairment, the claimant is "not disabled."

18

5.  Finally, the Commissioner will consider the claimant's ability to perform work ("residual functional capacity"), age, education and past work experience to determine whether or not the claimant is capable of performing other work which exists in the national economy.  If the claimant is incapable, a finding of disability will be entered. On the other hand, if the claimant can perform other work, the claimant will be found not to be disabled.

See 20 C.F.R. § 404.1520(b)-(f).

This analysis involves a shifting burden of proof.  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983).  In the first four steps of the analysis, the burden is on the claimant to prove every element of her claim by a preponderance of the evidence.  In the final step, however, the Commissioner bears the burden of proving that work is available for the petitioner: "Once a claimant has proved that he is unable to perform his former job, the burden shifts to the Commissioner to prove that there is some other kind of substantial gainful employment he is able to perform."  Kangas, 823 F.2d at 777.

That final step is key here because the ALJ determined that Plaintiff is unable to perform her past relevant work.  Thus, although the Court reviews the ALJ's determination on a substantial evidence standard, as discussed below, it does so keeping in mind that Defendant had the burden of proof on the availability of other work in the national economy.

19

**B.    Standard of Review**

Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a complainant's application for Social Security benefits.  Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001); Sykes v. Apfel, 228 F.3d 259, 262 (3d Cir. 2000); Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  Substantial evidence means more than "a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971)(quoting Consolidated Edison Co. V. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).

A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984).  "[A] court must 'take into account whatever in the record fairly detracts from its weight.'" Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997) (quoting Willbanks v. Secretary of Health

& Human Servs., 847 F.2d 301, 303 (6th Cir. 1988) (quoting
Universal Camera Corp. V. NLRB, 340 U.S. 474, 488 (1951)).

The Commissioner "must adequately explain in the record his
reasons for rejecting or discrediting competent evidence." Ogden
v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing Brewster
v. Heckler, 786 F.2d 581 (3d Cir. 1986)).  The Third Circuit has
held that an "ALJ must review all pertinent medical evidence and
explain his conciliations and rejections." Burnett v. Comm'r of
Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  Similarly,
an ALJ must also consider and weigh all of the non-medical
evidence before him.  Id. (citing Van Horn v. Schweiker, 717 F.2d
871, 873 (3d Cir. 1983); Cotter v. Harris, 642 F.2d 700, 707 (3d
Cir. 1981).

The Third Circuit has held that access to the Commissioner's
reasoning is essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all
> evidence and has sufficiently explained the
> weight he has given to obviously probative
> exhibits, to say that his decision is
> supported by substantial evidence approaches
> an abdication of the court's duty to
> scrutinize the record as a whole to determine
> whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  A district
court is not "empowered to weigh the evidence or substitute its
conclusions for those of the fact-finder." Williams, 970 F.2d at
1182.  However, an ALJ need not explicitly discuss every piece of

relevant evidence in his decision.  See Fargnoli v. Massanari, 247 F.3d at 42.

Moreover, apart from the substantial evidence inquiry, a reviewing court is entitled to satisfy itself that the Commissioner arrived at his decision by application of the proper legal standards.  Sykes, 228 F.3d at 262; Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983); Curtin v. Harris, 508 F. Supp. 791, 793 (D.N.J. 1981).

**C.   Analysis**

1.   Whether the ALJ Improperly Rejected the Opinion of Treating Physician Leslie D'Ambola

Plaintiff argues that the ALJ improperly rejected the opinion of her treating physician, Dr. Leslie D'Ambola, as expressed on a Physical Residual Functional Capacity Questionnaire.  The ALJ rejected the specific opinions on this form as being unsupported by the medical evidence.  Defendant notes that an ALJ may reject the opinion of a treating physician that is unsupported by the medical records.

Although the ALJ must examine all evidence of record, treating physicians have important perspectives on claimants' impairments, as the Commissioner recognizes:

> Generally, [the Social Security Administration] give[s] more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical

22

impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(d)(2). "[T]he ALJ must . . . pay close attention to the medical findings of a treating physician." Brewster v. Heckler, 786 F.2d 581, 584 (3d Cir. 1986).

The Third Circuit [has a] long held position that "[a] court considering a claim for disability benefits must give greater weight to the findings of a treating physician." Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993); see Kane v. Heckler, 776 F.2d 1130, 1135 (3d Cir. 1985). This is particularly true "'when the opinion reflects an expert judgement based on a continuing observation of the patient's condition over a prolonged period of time.'" Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987) (quoting Podedworny v. Harris, 745 F.2d 210, 217 (3d Cir. 1984)).

The Third Circuit has also held that the ALJ cannot reject a treating physician's testimony in the absence of contradictory medical evidence. See Jones v. Sullivan, 954 F.2d 125, 128-129 (3d Cir. 1991); Frankenfield v. Bowen, 861 F.2d 405, 408 (3d Cir. 1988); Rossi v. Califano, 602 F.2d 55, 58 (3d Cir. 1979). However, an ALJ can reject the opinion of a treating physician if [the ALJ] explains on the record the reasons for doing so. See Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989); Brewster, 786 F.2d at 585.

23

Schonewolf v. Callahan, 972 F. Supp. 277, 285 (D.N.J. 1997)

     In this case, Dr. D'Ambola, a physician with a long treating
history with Plaintiff, completed a Physical Residual Functional
Capacity Questionnaire on August 18, 2004.  (R. at 458-463.)  Dr.
D'Ambola indicated that Plaintiff suffers from asthma, obesity,
Type II Diabetes, a panic disorder, major depression, a seizure
disorder, a torn rotator cuff on the right shoulder and
tendonitis on the right shoulder.  (R. at 458.)  The clinical
findings and objective signs Dr. D'Ambola identified were reduced
range of motion in Plaintiff's right upper extremity.  (R. at
459.)  Dr. D'Ambola also indicated that, according to Plaintiff's
self-report, she experiences pain frequently and she has marked
limitation in her ability to deal with work stress.  (R. at 460.)
When asked to estimate how many city blocks Plaintiff could walk
without rest, Dr. Ambola responded "3-5?," indicating that it was
merely the doctor's guess that Plaintiff could walk from three to
five city blocks without stopping to rest.  (Id.)  Dr. D'Ambola
also indicated that Plaintiff could sit for one hour at a time,
stand for one hour at a time, and sit and stand for four hours
each in a work day "per patient report."  (Id.)  Next, Dr.
D'Ambola indicated that Plaintiff needed to include periods of
walking around during the workday about once per hour, (id.), for
ten minutes (R. at 461).  Dr. D'Ambola also indicated that
Plaintiff needs a job where she can shift positions at will from

24

sitting, standing, or walking and that she will need unscheduled breaks twice in a eight-hour workday, for ten minutes at a time each.  (Id.)  At the end of the evaluation, Dr. D'Ambola wrote, "Also for a more accurate evaluation, I recommend sending her to a physical medicine rehab specialist for a functional capacity evaluation."

Thus, the recommendations contain numerous qualifications, including the question mark, the "per patient's report" and this final sentence, indicating that Dr. D'Ambola was not confident in the physical assessment she performed.  Accordingly, the opinions expressed in the report were not supported by medical evidence and the ALJ was permitted to reject them as he did.[12]

However, Dr. D'Ambola's report, although purportedly an assessment of Plaintiff's physical capacities, contained significant indications that the doctor was most concerned about her psychological limitations.  Dr. D'Ambola starred and circled the question about whether emotional factors contribute to the severity of Ms. Wooten's symptoms and limitations, noting that "Emotional factors have a major effect on patient's symptoms and physical limitations."  (R. at 459.)  Dr. D'Ambola also noted

---

[12]  Indeed, Plaintiff testified at the hearing that she does not suffer from lower back pain (R. at 484), which would typically restrict a person's ability to sit or stand for long periods of time.  Although Plaintiff did complain of neck pain, it is not clear whether that pain is related to Dr. D'Ambola's recommended limitations on sitting and standing.

"Ms. Wooten reports feeling agitated under stress. In my opinion she **cannot handle** stressful work situations.  For a more accurate evaluation you'll need a report from the psychotherapist."  (R. at 463.)   Thus, Dr. D'Ambola indicated that Plaintiff's primary treatment for her numerous psychological and emotional issues came from her therapist, and not from a physician.

The ALJ was entitled to credit the portion of Plaintiff's treating physician's recommendation that was supported by objective medical evidence and to reject the portion -- suggesting frequent breaks as well as the need to change positions -- that has no apparent basis in the medical evidence. See 20 C.F.R. §§ 404.1527(d)(2)(treating physician's opinion that is not supported by objective evidence is not controlling); 20 C.F.R. § 404.1527(d)(3) (treating physician's explanation of conclusions and provision of objective findings are factors in determining what weight SSA will give physician's conclusions); 20 C.F.R. § 416.927(d)(3) (same).  In this case, the ALJ did not err by rejecting Dr. D'Ambola's reported restrictions on Plaintiff's abilities to sit, stand and walk or her need for breaks.

2.   Whether the ALJ Ignored Relevant Medical Records
            from St. Luke's Physicians

Plaintiff also argues that the ALJ ignored relevant evidence from Dr. D'Ambola and other treating physicians who indicated, at

26

various points in time, that Plaintiff is disabled or unable to return to work.  (Cl. Br. at 12-13.)

The Commissioner retains the responsibility of determining administrative findings that are dispositive of the case, 20 C.F.R. §§ 404.1527(e), 416.927(e), including residual functional capacity and whether an individual meets the statutory definition of disability,  20 C.F.R. §§ 404.1527(e), 416.927(e).  Thus, so long as the ALJ addressed the medical evidence in the record, he has no additional obligation to discuss any doctor's ultimate conclusions about whether and when a claimant can return to work.

Further, as the ALJ discussed, much of Plaintiff's medical evidence that restricts her ability to work relates to her post-surgery recovery.  Plaintiff had shoulder surgery in January of 2000.  (R. at 29.)  The medical evidence in the record indicates that although she has recovered somewhat from that surgery, she experiences pain and a reduced range of motion in her right upper extremity, as well as a limited capacity to lift.  (R. at 29-30.) The ALJ properly accounted for these limitations in formulating his assessment of Plaintiff's RFC, and she does not point to any assessment of her physical ability with regard to her right arm or shoulder that is in error.

Accordingly, the Court finds that the ALJ did not err by rejecting outdated conclusions by Plaintiff's treating physicians about her ability to return to work expressed in terms of

27

physical limitations.  The limitations imposed by Plaintiff's cognitive, psychological, and emotional impairments, however, paint a much different picture of her ability to return to work, as next discussed.

>    3.    Whether the ALJ Improperly Rejected the Opinion of
>           Treating Therapist Jennifer Sherman

Finally, and most importantly, Plaintiff claims the ALJ improperly rejected evidence of her severe psychological, cognitive and emotional impairments because it was generated by Jennifer Sherman, a licensed professional counselor with a master's degree.  Plaintiff further argues that the ALJ completely ignored evidence from Dr. Edward Tobe, a psychiatrist, and Dr. Rudy Horwitz, a psychologist and vocational expert.

Jennifer Sherman has been Plaintiff's psychotherapist since April of 2003 and sees her for individual therapy every other week. (R. at 428.)  Ms. Sherman indicates that Plaintiff is severely depressed, suffers from panic attacks and hallucinations.  The ALJ failed to account for this and other credible evidence of Plaintiff's panic attacks and hallucinations when formulating her RFC and determining that she was able to work.

The ALJ credited the assessments by Ms. Sherman as competent evidence, as he should have.  "Opinions from these medical sources, who are not technically deemed 'acceptable medical

sources' under [SSA's] rules, are important and should be
evaluated on key issues such as impairment severity and
functional effects, along with the other relevant evidence in the
file." SSR 06-3p.  Such opinions are especially important when
formed during ongoing treatment relationships and when, as in
this case, there is no "acceptable medical source," 20 C.F.R. §§
404.927(a), 416.927(a), treating the claimant for the relevant
condition.  Here, Ms. Sherman was the only professional treating
Plaintiff for her psychological impairments.[13]

Nevertheless, the ALJ was permitted to reject Ms. Sherman's
assessment of Plaintiff's limitations if the record as a whole
failed to show why Plaintiff would be as limited as Ms. Sherman
indicated or Ms. Sherman failed to explain why she thought
Plaintiff was limited in the ways she indicated.  In other words,
the ALJ can reject the portions of an opinion of a treating
source that is not supported by the record.  Here, the ALJ did
not merely reject Ms. Sherman's evaluation because of her status
as a counselor.  Instead, he accepted some of Ms. Sherman's
opinions and rejected others.  For example, he accommodated the
noted limitations on Plaintiff's ability to deal with criticism,

---

[13]  It bears noting that Plaintiff's treating physician of
many years, Dr. D'Ambola, was most concerned about the severity
of her psychological limitations and inability to handle stress,
as discussed in Part III.C.1., supra.  This treating physician's
emphatic notation should have heightened, not diminished, the
attention paid to Ms. Sherman's mental health diagnoses and
opinions.

but rejected the asserted limitations on Plaintiff's abilities to work without distraction, to regularly attend work, and to respond appropriately to changes in the work setting.  The ALJ rejected evidence by Plaintiff's psychological counselor that indicated more severe limitations in her abilities because the ALJ found that those limitations were not supported by the record.  (R. at 34.)

However, the record as a whole, including evidence from medical and non-medical sources, consistently indicated that Plaintiff suffered from severe depression, panic attacks, and hallucinations.  The ALJ failed to address whether and how often Plaintiff was likely to suffer panic attacks or hallucinations at work and how such episodes might affect her ability to complete the repetitive work he indicated was available to her in the national economy.  It was imperative for him to do so, as there is no contradictory evidence in the record about Plaintiff's panic attacks and there is not substantial evidence contradicting Plaintiff's tendency to hallucinate.  On the contrary, the ALJ appeared to credit the sources - including Plaintiff's testimony - that indicated panic attacks and hallucinations significantly impacted on Ms. Wooten's life.

Because the ALJ completely failed to address how evidence of Ms. Wooten's panic attacks or hallucinations affected her RFC,

30

the Court cannot affirm the Commissioner's determination that Plaintiff is not disabled.

**IV.  CONCLUSION**

For the reasons explained above, the Court shall remand this matter to Social Security Administration for a redetermination of Plaintiff's residual functional capacity, taking into account all of the available medical and non-medical evidence of her physical, cognitive, and psychological limitations, especially including her panic attacks and her hallucinations.  An appropriate Order shall be entered.


**March 12, 2008**                          **s/ Jerome B. Simandle**
Date                                    JEROME B. SIMANDLE
                                        U.S. District Judge